1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4    MANUEL FLORES,                    )        No. C 04-3409 SBA (PR)
                                       )
5              Petitioner,             )        **ORDER DENYING PETITION**
          v.                           )        **FOR WRIT OF HABEAS**
6                                      )        **CORPUS**
     A.P. KANE, Warden,                )
7                                      )
               Respondent.             )
8    _____  )

9                             **INTRODUCTION**

10        Petitioner Manuel Flores, a state prisoner incarcerated at the Correctional Training Facility,

11   filed this pro se action seeking a writ of habeas corpus under 28 U.S.C. § 2254.  The matter is now

12   submitted for the Court's consideration of the merits of the petition.  For the reasons discussed

13   below, the petition is DENIED as to all claims.

14                      **PROCEDURAL BACKGROUND**

15

16        In 1990, Petitioner was convicted in the Los Angeles County Superior Court of three counts

17   of kidnap for robbery in violation of California Penal Code § 209(b).  He was sentenced to a term of

18   seven years to life in state prison.  The present petition does not challenge Petitioner's underlying

19   conviction.  Rather, it challenges the denial of parole suitability by the Board of Prison Terms

20   ("BPT") at a hearing held in May, 2003.

21        At the 2003 hearing, the BPT found Petitioner unsuitable for parole and denied him another

22   hearing for a period of two years.  (Resp't Ex. 3 at 51-52.)  Petitioner sought habeas corpus relief

23   from the Los Angeles County Superior Court which, in a reasoned decision, denied the petition.

24   (Resp't Ex. 7, 8.)  Thereafter, the California Court of Appeal summarily denied a petition

25   challenging the 2003 hearing.  (Resp't Ex. 9.)  The California Supreme Court denied Petitioner's

26   request for review.  (Resp't Ex. 11).

27        On August 19, 2004, Petitioner filed the present petition, challenging only the denial of

28   parole at his 2003 hearing (docket no. 1).  Petitioner claims that the 2003 parole denial violated his

     right to due process because the BPT did not meet the "some evidence" standard to support its

United States District Court
For the Northern District of California

1    decision, and because the BPT relied solely on the nature of the commitment offense.

2         On February 6, 2006, Respondent filed a motion to dismiss the petition, arguing that the

3    petition should be dismissed for lack of subject matter jurisdiction as to the equal protection claim

4    on the ground that Petitioner had failed to allege sufficient facts to state a prima facie claim and as

5    to the due process claim on the ground that there is no federally protected liberty interest in parole

6    (docket no. 4). Petitioner filed an opposition to the motion to dismiss on March 8, 2006 (docket no.

7    5), and Respondent filed a reply on March 20, 2006 (docket no. 7). On August 21, 2006, the Court

8    granted the motion to dismiss with respect to the equal protection claim, but denied the motion with

9    respect to the due process claim upon finding that Petitioner had a liberty interest in parole (docket

10   no. 9). The Court then re-issued the order to show cause and directed Respondent to show cause

11   why the petition should not be granted.

12        On October 17, 2006, Respondent filed an answer (docket no. 10). Petitioner then filed a

13   traverse on December 29, 2006 (docket no. 13).

14                              **STANDARD OF REVIEW**

15   **I.    AEDPA**

16        Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a district court may

17   grant a petition challenging a state conviction or sentence on the basis of a claim that was

18   "adjudicated on the merits" in state court only if the state court's adjudication of the claim:

19   "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

20   established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a

21   decision that was based on an unreasonable determination of the facts in light of the evidence

22   presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court has "adjudicated" a

23   petitioner's constitutional claim "on the merits" for purposes of § 2254(d) when it has decided the

24   petitioner's right to post-conviction relief on the basis of the substance of the constitutional claim

25   advanced, rather than denying the claim on the basis of a procedural or other rule precluding state

26   court review on the merits. Lambert v. Blodgett, 393 F.3d 943, 969 (9th Cir. 2004), cert. denied, 126

27   S. Ct. 484 (2005). It is error for a federal court to review de novo a claim that was adjudicated on the

28   merits in state court. See Price v. Vincent, 538 U.S. 634, 638-43 (2003).

United States District Court
For the Northern District of California

2

United States District Court
For the Northern District of California

1    Section 2254(d) applies to a habeas petition from a state prisoner challenging the denial of

2    parole.  See Sass v. California Bd. of Prison Terms, 461 F.3d 1123, 1126-27 (9th Cir. 2006).

3        **A.    Section 2254(d)(1)**

4        Challenges to purely legal questions resolved by the state court are reviewed pursuant to

5    § 2254(d)(1), under which a state prisoner may obtain habeas relief with respect to a claim

6    adjudicated on the merits in state court only if the state court adjudication resulted in a decision that

7    was "contrary to" or "involved an unreasonable application of" "clearly established Federal law, as

8    determined by the Supreme Court of the United States."  Williams  v. Taylor, 529 U.S. 362, 402-04,

9    409 (2000).  While the "contrary to" and "unreasonable application" clauses have independent

10   meaning, see id. at 404-05, they often overlap, which may necessitate examining a petitioner's

11   allegations against both standards, see Van Tran v. Lindsey, 212 F.3d 1143, 1149-50 (9th Cir. 2000),

12   overruled on other grounds, Lockyer v. Andrade, 538 U.S. 63, 70-73 (2003).

13       **1.    Clearly Established Federal Law**

14       "[C]learly established federal law, as determined by the Supreme Court of the United States"

15   refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of

16   the relevant state-court decision."  Williams, 529 U.S. at 412.  "Section 2254(d)(1) restricts the source

17   of clearly established law to [the Supreme] Court's jurisprudence."  Id.  "A federal court may not

18   overrule a state court for simply holding a view different from its own, when the precedent from [the

19   Supreme] Court is, at best, ambiguous."  Mitchell v. Esparza, 540 U.S. 12, 17 (2003).  If there is no

20   Supreme Court precedent that controls on the legal issue raised by a petitioner in state court, the state

21   court's decision cannot be contrary to, or an unreasonable application of, clearly-established federal

22   law.  See, e.g., Stevenson v. Lewis, 384 F.3d 1069, 1071 (9th Cir. 2004).

23       The fact that Supreme Court law sets forth a fact-intensive inquiry to determine whether

24   constitutional rights were violated "obviates neither the clarity of the rule nor the extent to which the

25   rule must be seen as 'established'" by the Supreme Court.  Williams, 529 U.S. at 391.  There are,

26   however, areas in which the Supreme Court has not established a clear or consistent path for courts to

27   follow in determining whether a particular event violates a constitutional right; in such an area, it may

28

3

be that only the general principle can be regarded as "clearly established." <u>Andrade</u>, 538 U.S. at 64-65.  When only the general principle is clearly established, it is the only law amenable to the "contrary to" or "unreasonable application of" framework.  <u>See id.</u> at 73.

Circuit decisions may still be relevant as persuasive authority to determine whether a particular state court holding is an "unreasonable application" of Supreme Court precedent or to assess what law is "clearly established."  <u>Clark v. Murphy</u>, 331 F.3d 1062, 1070-71 (9th Cir. 2003), <u>cert. denied</u>, 540 U.S. 968 (2003); <u>Duhaime v. Ducharme</u>, 200 F.3d 597, 600 (9th Cir. 1999).

### 2.    **"Contrary to"**

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 412-13.  A "run-of-the-mill state-court decision" that correctly identifies the controlling Supreme Court framework and applies it to the facts of a prisoner's case "would not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." <u>Williams</u>, 529 U.S. at 406.  Such a case should be analyzed under the "unreasonable application" prong of § 2254(d).  <u>See</u> <u>Weighall v. Middle</u>, 215 F.3d 1058, 1062 (9th Cir. 2000).

### 3.    **"Unreasonable Application"**

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Williams</u>, 529 U.S. at 412-13.

"[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." <u>Id.</u> at 411; <u>accord</u> <u>Middleton v. McNeil</u>, 541 U.S. 433, 436 (2004) (per curiam) (challenge to state court's application of governing federal law must be not only erroneous, but objectively unreasonable); <u>Woodford v. Visciotti</u>, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable" application of law is not equivalent to "incorrect" application of law).

4

**United States District Court**
For the Northern District of California

Evaluating whether a rule application was unreasonable requires considering the relevant rule's specificity; if a legal rule is specific, the range of reasonable judgment may be narrow; if it is more general, the state courts have more leeway.  <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004).  Whether the state court's decision was unreasonable must be assessed in light of the record that court had before it.  <u>Holland v. Jackson</u>, 542 U.S. 649, 651 (2004) (per curiam).

The objectively unreasonable-standard is not a clear error standard.  <u>Andrade</u>, 538 U.S. at 75-76 (rejecting <u>Van Tran</u>'s use of "clear error" standard); <u>Clark</u>, 331 F.3d at 1067-69 (acknowledging the overruling of <u>Van Tran</u> on this point).  After <u>Andrade</u>, "[t]he writ may not issue simply because, in our determination, a state court's application of federal law was erroneous, clearly or otherwise.  While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them."  <u>Id.</u> at 1068.  In examining whether the state court decision was unreasonable, the inquiry may require analysis of the state court's method as well as its result.  <u>Nunes v. Mueller</u>, 350 F.3d 1045, 1054 (9th Cir. 2003).

**B.      Section 2254(d)(2)**

A federal habeas court may grant the writ if it concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(2).  An unreasonable determination of the facts occurs where the state court fails to consider and weigh highly probative, relevant evidence, central to the petitioner's claim, that was properly presented and made part of the state-court record.  <u>Taylor v. Maddox</u>, 366 F.3d 992, 1005 (9th Cir. 2004).  A district court must presume correct any determination of a factual issue made by a state court unless the petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

**C.      Review of Parole Suitability Decisions**

The Ninth Circuit has applied § 2254(d) to review of parole suitability decisions.  <u>See</u> <u>Rosas v. Nielsen</u>, 428 F.3d 1229, 1232 (9th Cir. 2005) (per curiam); <u>see also</u> <u>McQuillion v. Duncan</u>, 306 F.3d 895, 901 (9th Cir. 2002) (assuming without deciding that AEDPA deferential standard of review under § 2254 applies to such decisions).

II.    **Exhaustion**

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b), (c). The parties do not dispute that state court remedies were exhausted for the claims asserted in the instant petition.

## FACTUAL BACKGROUND

Although Petitioner does not challenge the validity of his underlying criminal conviction, the BPT panel relied on facts regarding the commitment offense when denying Petitioner's parole in 2003. The facts regarding the circumstances surrounding the offense were read into the record at the hearing and were not objected to by Petitioner, and are in accord with those summarized in the probation report prepared for the sentencing court after Petitioner's conviction. The Court includes that summary here:

> On [August 19, 1990] at approximately 4:00 A.M., victim [Brian] French had stopped his car for a redlight southbound Azusa at Hurley Avenue when [Petitioner] entered his car from the front passenger door, waving a broken beer bottle. He yelled drive, and fearing for his life, victim French complied. [Petitioner] began to speak in Spanish in an excited, agitated manner. In that victim French could understand no Spanish, he was unaware of what was going on but he did understand or thought he understood that this person was asking for help. Acting on the possibility that he was asking for help, victim French drove him to a friend's house in Hacienda Heights who spoke Spanish so he could find out what was going on.
>
> When they arrived at [victim French's] friend's house, [Petitioner] exited the vehicle and started talking with victim [Oscar] Alvarez. Apparently he told victim Alvarez that he and a friend had been jumped by some "Cholos" and that he was fleeing when he got into victim French's car. After speaking for approximately 15 minutes, [Petitioner] wanted to know if victim French would drive him to Santa Ana, but was told that he could not do that because it was too far. He then said he needed money and asked if any of them had any. At this time, he was standing close by victim [Susan] Witzel and before anyone knew what was happening he had grabbed her by the hair with his left hand, and pulled her onto the hood of victim French's car where he held the broken beer bottle to her throat and demanded money. Fearing for victim Witzel's safety, victim Alvarez and French gave up all the money they had. He then ordered them to go into the house and while in the house he took some clothes and had victim Alvarez [] tie them in a bundle. He then ordered all of them in the car, and he got into the car and started driving. In the car, he was driving and holding victim Witzel in the front seat with the broken beer bottle with his right hand. He drove to the eastbound 60

United States District Court
For the Northern District of California

6

freeway to the 57 freeway where he turned south toward Santa Ana.  As he was driving he told victim Alvarez that he was going to go to Tijuana and asked him if he wanted to go with him or [if] he want[ed] to be let out.  Alvarez felt that it would be in the best interest of all of them if he appeared cooperative and  sympathetic towards [Petitioner] and he said that he would go with him to Tijuana, but they should stop and get some gas for the trip.  [Petitioner] agreed and stopped at the Exxon gas station at 102 Main Street in Santa Ana.

As they were putting gas into the car [Petitioner] left the broken bottle of beer in the car, and at that time victim Witzel took the beer bottle and ran to a phone where she called the police.  In that the beer bottle was no longer available to [Petitioner] both victim French and victim Alvarez overpowered him and waited for the police['s] arrival.  When the police arrived they detained [Petitioner] but found that the crime had occurred in Los Angles County, so Los Angeles County Sheriff's were called.  When the Los Angeles Sheriff's arrived at the Santa Ana Station [Petitioner] was placed under arrest and booked on the indicated charges.

(Resp't Ex. 4, Probation Officer's Report at 2-4 [brackets and paragraph breaks added].)

Victims French, Alvarez and Witzel gave statements to probation officer and indicated that no one was injured and that there was no damage to the car.  (Id. at 5-6.)  They also expressed the hope that Petitioner would be "taken off the street for as long as possible."  (Id.)  Petitioner later gave his version of the events and acknowledged that "prior to the commission of his crime, he had consumed beer, wine, marijuana and cocaine."  (Resp't Ex. 5, Life Prisoner Evaluation Report at 2.)

## DISCUSSION

### I.  The Requirements of Federal Due Process

"In analyzing the procedural safeguards owed to an inmate under the Due Process Clause, [the Court] must look at two distinct elements:  (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections."  Biggs v. Terhune, 334 F.3d 910, 913 (9th Cir. 2003).  The second prong of this test is satisfied if (1) the inmate has been afforded an opportunity to be heard and, if denied parole, informed of the reasons underlying the decision and (2) "some evidence" supports the decision to grant or deny parole.  Sass, 461 F.3d at 1129 (adopting "some evidence" standard for disciplinary hearings outlined in Superintendent v. Hill, 472 U.S. 445, 454-55 (1985)).

"To determine whether the 'some evidence' standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    evidence.  Instead, the relevant question is whether there is any evidence in the record that could

2    support the conclusion reached'" by the parole board.  Sass, 461 F.3d at 1128 (quoting Hill, 472 U.S.

3    at 455-56).  The "'some evidence' standard is minimal, and assures that 'the record is not so devoid of

4    evidence that the finding of the . . . board were without support or otherwise arbitrary.'"  Sass, 461

5    F.3d 1129 (quoting Hill, 472 U.S. at 457).  The "some evidence" standard of Hill is clearly

6    established law in the parole context for purposes of § 2254(d).  Sass, 461 F.3d at 1129.

7         Three Ninth Circuit cases provide the guideposts for applying the Hill "some evidence"

8    standard on this point:  Biggs, Sass, and Irons v. Carey, No. 05-15275, slip op. 8335, 8344 (9th Cir.

9    July 13, 2007).  Biggs explained that the value of the criminal offense fades over time as a predictor

10   of parole suitability:  "The Parole Board's decision is one of 'equity' and requires a careful balancing

11   and assessment of the factors considered. . . .  A continued reliance in the future on an unchanging

12   factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the

13   rehabilitative goals espoused by the prison system and could result in a due process violation."

14   Biggs, 334 F.3d at 916-17.  Biggs upheld the initial denial of a parole release date based solely on

15   the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver

16   time . . ., should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation,

17   denying him a parole date simply because of the nature of Biggs' offense and prior conduct would

18   raise serious questions involving his liberty interest in parole."  Id. at 916.  Next came Sass, which

19   criticized the Biggs statements as improper and beyond the scope of the dispute before the court:

20   "Under AEDPA it is not our function to speculate about how future parole hearings could proceed."

21   Sass, 461 F.3d at 1129.  Sass determined that the parole board is not precluded from relying on

22   unchanging factors such as the circumstances of the commitment offense or the petitioner's pre-

23   offense behavior in determining parole suitability.  See id. (commitment offenses in combination

24   with prior offenses provided some evidence to support denial of parole at subsequent parole

25   consideration hearing).  Sass also put to rest any idea from Biggs that the commitment crime and

26   pre-offense behavior only support the initial denial of parole.  Recently, Irons determined that due

27   process was not violated by the use of the commitment offense and pre-offense criminality to deny

28

8

parole for a prisoner sixteen years into his seventeen-to-life sentence.  Irons emphasized that all three cases (Irons, Sass and Biggs) in which the court had "held that a parole board's decision to deem a prisoner unsuitable for parole solely on the basis of his commitment offense comports with due process, the decision was made before the inmate had served the minimum number of years required by his sentence."  Irons, slip op. at 8349.  Interpreting this statement from Irons to suggest that the offense can only be relied on until the minimum number of years has been reached would suffer the same problem that Sass identified in Biggs:  it is not the holding of the case.  The dicta in Biggs and Irons are speculative and do not determine when a denial of parole based solely upon the commitment offense or pre-offense behavior violates due process.  Neither logic nor Irons compel a decision that such reliance must cease when the prisoner reaches the minimum number of years in his sentence, such as the fifteenth year of a fifteen-to-life sentence.

The upshot of these three cases is that the BPT can look at immutable events, such as the nature of the conviction offense and pre-conviction criminality, to predict that the prisoner is not currently suitable for parole even after the initial denial (Sass), but the weight to be attributed to those immutable events should decrease over time as a predictor of future dangerousness as the years pass and the prisoner demonstrates favorable behavior (Biggs and Irons).  Sass did not dispute the principle that, other things being equal, a murder committed fifty years ago is less probative of a prisoner's current dangerousness than one committed ten years ago.  Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison count for something according to Biggs and Irons.  Hill's standard might be quite low, but it does require that the decision not be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision.

What little guidance has come from the Supreme Court suggests that judicial review should be extremely deferential to the original decision-maker in the parole context.  In addition to the very low evidentiary standard that Hill imposes, other Supreme Court comments suggest that the judiciary should be quite mindful of the subjective and predictive nature of a parole board's decision.  See Greenholtz, 442 U.S. at 13.  "No ideal, error-free way to make parole-release decisions has been

9

developed; the whole question has been and will continue to be the subject of experimentation involving analysis of psychological factors combined with fact evaluation guided by the practical experience of the actual parole decisionmakers in predicting future behavior.  Our system of federalism encourages this state experimentation."  Id.

**II.     Standards for Granting Parole in California**

California's parole scheme sets out the criteria which the BPT must evaluate when considering whether a prisoner is suitable for parole.  Thus, in order to meet the requirements of due process, the BPT's determination that the prisoner is not suitable for parole under this scheme must be supported by some evidence.

A prisoner's first parole suitability hearing is to be held one year before the prisoner's minimum eligible parole release date. CAL. PENAL CODE § 3041(a).  At the hearing, the parole board "shall" set a release date,

> unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual, and that a parole date, therefore, cannot be fixed at this meeting.

Id. § 3041(b).

Title 15 of the California Code of Regulations §§ 2280 set forth the criteria the BPT must consider when determining whether a release date can be set for a prisoner like Petitioner, who is serving an indeterminate sentence for a conviction of kidnap for robbery.  The opening paragraph of section 2281(a) states:

> Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

CAL. CODE REGS. tit. 15, § 2281(a).

In making its determination, the parole board is to consider "[a]ll relevant, reliable information available," including the circumstances of the prisoner's:

> . . . social history; past and present mental state; past criminal history, including involvement in other criminal misconduct which is reliably documented; the base and other commitment offenses, including behavior before, during and after the crime; past and present attitude toward the crime; any conditions of treatment or control, including

10

**United States District Court**
For the Northern District of California

1       the use of special conditions under which the prisoner may safely be released to the
2  community; and any other information which bears on the prisoner's suitability for
3  release.  Circumstances which taken alone may not firmly establish unsuitability for
   parole may contribute to a pattern which results in a finding of unsuitability.

4  Id. § 2281(b).

5       Circumstances tending to show unsuitability for parole include the nature of the commitment

6  offense, and consideration of whether "[t]he prisoner committed the offense in an especially heinous,

7  atrocious or cruel manner."  Id. § 2281(c).  This includes consideration of the number of victims,

8  whether "[t]he offense was carried out in a dispassionate and calculated manner," whether the victim

9  was "abused, defiled or mutilated during or after the offense," whether "[t]he offense was carried out

10 in a manner which demonstrates an exceptionally callous disregard for human suffering," and

11 whether "[t]he motive for the crime is inexplicable or very trivial in relation to the offense."  Id.

12      Other circumstances tending to show unsuitability for parole are a previous record of

13 violence, an unstable social history, previous sadistic sexual offenses, a history of severe mental

14 health problems related to the offense, and serious misconduct in prison or jail.  See id.

15      Circumstances tending to support a finding of suitability for parole include no juvenile

16 record, a stable social history, signs of remorse, that the crime was committed as a result of

17 significant stress in the prisoner's life, a lack of criminal history, a reduced possibility of recidivism

18 due to the prisoner's present age, that the prisoner has made realistic plans for release or has

19 developed marketable skills that can be put to use upon release, and that the prisoner's institutional

20 activities indicate an enhanced ability to function within the law upon release.  See id. § 2281(d).

21      The regulations also contain a matrix of suggested base terms that prisoners with

22 indeterminate sentences should serve before they are released on parole.  The term is to be set

23 depending solely on the gravity of the "base offense," which is defined as "the most serious of all

24 life offenses for which the prisoner has been committed to prison."  Id. § 2282(a).

25      The regulations specify that the matrix is invoked only after a life inmate is "found suitable

26 for parole."  CAL. CODE REGS. tit. 15, §§ 2402(a), 2403(a).  The California Code of Regulations

27 state that:

28

United States District Court
For the Northern District of California

> The panel shall first determine whether the life prisoner is suitable for release on parole. Regardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison.

Id. § 2402(a).

> Thereafter, the regulations state:

> The panel shall set a base term for each life prisoner who is found suitable for parole. The base term shall be established solely on the gravity of the base crime, taking into account all of the circumstances of that crime. . . . The base term shall be established by utilizing the appropriate matrix of base terms provided in this section. The panel shall determine the category most closely related to the circumstances of the crime. The panel shall impose the middle base term reflected in the matrix unless the panel finds circumstances in aggravation or mitigation.

Id. § 2403(a).

Thus, California Penal Code § 3041 and the applicable regulations outlined above separate the suitability determination from setting a release date, and make it clear that the determination of an appropriate release date occurs only after deciding that an inmate is suitable for parole. CAL. PENAL CODE § 3041; In re Dannenberg, 34 Cal. 4th 1061, 1082-83 (2005). As a result, the BPT may lawfully deny parole without comparing Petitioner's offense to other inmates with the same offense, "to [the BPT's] base term matrices, or to the minimum statutory prison term for that offense." Id. at 1098. Because an inmate's base term can be set only once he has been found suitable for parole, the statutory scheme places individual suitability for parole above a prisoner's expectancy in an early setting of a fixed date designed to ensure term uniformity. See id. at 1070-71.

> While subdivision (a) of section 3041 states that indeterminate life (i.e., life-maximum) sentences should "normally" receive "uniform" parole dates for similar crimes, subdivision (b) provides that this policy applies "*unless* [the Board] determines" that a release date cannot presently be set because the particular offender's crime and/or criminal history raises "*public safety*" concerns requiring further indefinite incarceration. (Italics added.) Nothing in the statute states or suggests that the Board must evaluate the case under standards of term uniformity before exercising its authority to deny a parole date on the grounds the particular offender's criminality presents a *continuing public danger.*

1   Id. at 1070 (brackets and parenthesis in original).

2       In sum, "the Board, exercising its traditional broad discretion, may protect public safety in

3   each discrete case by considering the dangerous implications of a life-maximum prisoner's crime

4   individually." Id. at 1071.

5

6       In addition, the California Supreme Court has determined that the facts of the crime can

7   alone support a sentence longer than the statutory minimum even if everything else about the

8   prisoner is laudable.  "While the Board must point to factors beyond the minimum elements of the

9   crime for which the inmate was committed, it need engage in no further comparative analysis before

10  concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the

11  prisoner's release."  Id.; see also In re Rosenkrantz, 29 Cal. 4th 616, 682-83 (2002), cert. denied, 538

12  U.S. 980 (2003) ("[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for

13  denying parole" but might violate due process "where no circumstances of the offense reasonably

14  could be considered more aggravated or violent than the minimum necessary to sustain a conviction

15  for that offense").

16  **III.   Analysis**

17      **A.   Opportunity to Be Heard and Reasons for Denial**

18      Having stated that California inmates still maintain a liberty interest, the Court analyzes the

19  next prong of the Biggs test.  Under the second prong of the Biggs test, the first question pertains to

20  whether Petitioner was given an opportunity to be heard and whether he was given reasons for the

21  parole denial.  See Biggs, 334 F.3d at 913; Sass, 461 F.3d at 1126; Greenholtz, 442 U.S. at 16.

22      Petitioner fully participated in his parole hearing with the help of an interpreter, as evidenced

23  by the transcript of the hearing.  (Resp't Ex. 3.)  Throughout the hearing, Petitioner was given the

24  opportunity to make comments or objections in response to the BPT's statements, clarify any

25  misunderstandings and give statements regarding his parole eligibility.  (Id.)

26      In addition, the BPT laid out detailed reasons for denying Petitioner's parole, which are

27  discussed further below.  The Court finds that the BPT satisfied the requirements for due process

28

13

under this prong.

**B.**   **"Some Evidence" Standard**

**1.**   **The 2003 Parole Hearing**

Petitioner argues that the facts of the crime do not constitute some evidence, thus, the BPT's 2003 parole denial is in violation of his due process rights.  (Pet. at 3.)  The relevant question is whether there is some evidence to support the BPT's denial of parole.  See Sass, 461 F.3d at 1129 (adopting the "some evidence" standard for disciplinary hearings outlined in Hill, 472 U.S. at 454-55 (1985)).  The BPT determined that the Petitioner was unsuitable for parole on a variety of grounds, including the nature of the underlying offense, his unstable history and pattern of escalating criminal conduct, his need to continue self-help and therapy, his negative psychological evaluation, and the District Attorney's opposition to parole.

**a.**   **The Nature of the Offense**

At the 2003 parole suitability hearing, the BPT found that Petitioner "would pose an unreasonable risk of danger to society or a threat to public safety if released from prison at this time." (Resp't Ex. 3 at 46:12-14.)  The panel found that the "paramount reason" for such a finding was the "timing and gravity of the committing offense."  (Id. at 46: 14-16.)  The BPT found that the commitment offense was carried out in a manner that was "especially cruel and vicious."  (Id. at 46: 17.)  The BPT also found that multiple victims were involved in the kidnaping, i.e., a total of three victims, and that the "motive for the crime was inexplicable and very trivial in relationship to the offense, needing a ride to Mexico and claiming that [Petitioner] had just been jumped by Cholos." (Id. at 46:17-18, 47:9-13.)  In support of these findings, the BPT summarized the evidence regarding the kidnaping offenses as follows:

> You accosted the two victims initially at a stoplight.  They tried to be good Samaritans, they thought that you needed some help.  They took you to their friend's -- Mr. Alvarez -- home because he spoke some Spanish and you didn't speak any English at the time to try to help you.  The offense was carried out in a dispassionate and insensitive manner.  You know after they tried to help you here then you took them all and forced them to -- with a broken bottle point threatened them with their lives, you grabbed the young woman around the neck, grabbed her by her hair, threatened her life, you did this, as I said, with a broken bottle point, forcing them to drive towards Mexico.

United States District Court

For the Northern District of California

14

United States District Court

For the Northern District of California

1    (Id. at 46:21-47:9.)

2          b.        **Unstable Social History**

3          The BPT found Petitioner unsuitable for parole on other grounds, including that Petitioner

4    "has a history of unstable tremulous relationships with others commencing at an early age." (Id. at

5    47:16-18.)  It noted that he dropped out of school around the ninth grade and developed a substance

6    abuse problem with alcohol and drugs around the age of thirteen.  (Id. at 47:18-22.)  Additionally,

7    the BPT noted that there "is an escalating pattern of criminal conduct and violence that the prisoner

8    has as he entered the United States illegally around the age of 17 or 18." (Id. at 47:22-25.)

9

10          c.        **Unfavorable Psychological Evaluation and Need for Therapy**

11          The BPT also determined that Petitioner had "not sufficiently participated in beneficial self-

12    help and therapy." (Id. at 47:25-48:1.)  Relying on Petitioner's pyschosocial report authored by M .

13    E. Gleason, Ph.D., dated April 10, 2003, the BPT found that Petitioner's examiner was not "totally

14    supportive of release" because the doctor wrote that "the most significant risk factor for this prisoner

15    which could be a precursor to violence would be a return to the use of alcohol and/or drugs." (Id. at

16    48:1-8.)  Despite examining the factors of suitability that would support parole, i.e., that Petitioner

17    had plans for where to live and work if released (Mexico) and that his counselor believes him to be a

18    "low degree of threat if released to the public," the Panel found that Petitioner still "need[ed] therapy

19    in order to face, discuss, understand and cope with stress in a non-destructive manner so that the

20    prisoner can better understand the causative factors of why he committed the kidnap of three people

21    and . . . threatening the victims . . . [in a] very insensitive and uncaring manner." (Id. at 48:16 -

22    49:13.)  The BPT determined that "[u]ntil progress is made the prisoner continues to be

23    unpredictable and a threat to others." (Id. at 49:13-15.)

24          The BPT noted:

25          The prisoner's gains . . . are recent and he must demonstrate the ability to maintain
          these gains over an extended period of time.  He's been participating in AA since
26          2000, he's on a waiting list for the Impact program currently, just recently completed a
          vocational trade of offset print shop. . . .  [H]e's accomplished ESL, English as a
27          second language, and he should be commended for that and his ability -- that he's
          achieved a GED as well completing the ESL, as well as not having any 115s in his
28          entirety while he's been incarcerated.  However, these positive aspects of his behavior
          do not outweigh the factors of unsuitability at this time.

15

United States District Court
For the Northern District of California

1 | (Id. at 49:15-50:6.)

2

3      **d.  District Attorney's Opposition to Parole**

4    The Deputy District Attorney of Los Angeles County opposed Petitioner's suitability for

5 parole.  The BPT took notice that "the District Attorney's Office . . . of Los Angeles County had a

6 representative present in opposition."  Id. at 48:23-25.

7        **e.  Conclusion**

8    In conclusion, the panel listed fact-specific reasons to support its finding that Petitioner

9 unsuitable for parole:

10     That the prisoner committed the offense in a cruel and vicious manner as I mentioned
    earlier.  There were multiple victims who were attacked, Mr. French, Ms. Witzel and

11     Mr. Alvarez, in that same offense. . . . The victims tried to help the prisoner, tried to be
    good Samaritans.  As he did not speak Spanish they took him to a friend's home.  He

12     ended up kidnaping Mr. Alvarez.  As I said earlier, the motive for the crime was
    inexplicable and very trivial in relationship to the offense.  [Petitioner] needed a ride

13     to Mexico, claiming that he had been accosted by Cholos prior to -- The prisoner has a
    history of unstable tremulous relationships with others . . . commencing at an early

14     age, dropping out of school while in the ninth grade, forming a problem -- developing
    a problem with substance abuse around the age of 13 as well as entering the United

15     States illegally.  Therefore, a longer period of observation or evaluation of the prisoner
    is called for before the Board should find that he is suitable for parole.

16

17 (Id. at 50:11-51:8 [brackets added].)

18    The Court finds that the BPT's 2003 decision was based on a reasonable determination of the

19 facts and that there was some evidence to support the conclusion to deny Petitioner's parole.  28

20 U.S.C. 2254(d)(2).

21      **2.  Superior Court Denial**

22    On state habeas corpus review, the Los Angeles County Superior Court determined in a

23 reasoned opinion that "the Board's decision to decline to set a parole date [was] appropriate in this

24 instance."  (Resp't Ex. 7, Order Re: Writ of Habeas Corpus at 1.)  Upon review of the record and the

25 BPT's findings, the superior court determined that there was some evidence to support the finding

26 that "the commitment offense was carried out in an especially cruel and vicious manner."  (Id.)  "It

27 demonstrated an exceptionally callous disregard for human suffering.  Plus the nature for the crime

28 is inexplicable and very trivial in relationship to the offense."  (Id. [internal citations omitted].)  The

**United States District Court**
For the Northern District of California

1  superior court also noted that the BPT's finding of Petitioner's "history of unstable tremulous

2  relations with others commencing at an early age." (Id.)  Citing to In re Rosenkrantz, 29 Cal. 4th

3  616, 652 (2002), the court determined that the aforementioned findings were supported by "some

4  evidence." (Id.)  The court also noted that the record "reflects the Board considered [Petitioner's]

5  post conviction gains but concluded they did not outweigh 'consideration of public safety.'" (Id. at

6  2.)  The court concluded:  "Because there is some evidence to support the finding, [Petitioner] would

7  'pose an unreasonable risk of danger to society if released from prison'. . . .  [t]he Board did not

8  abuse its discretion in denying parole for [Petitioner] at the 2003 hearing." (Id. [internal citations

9  omitted].)

10      Because the superior court's decision is the last reasoned decision regarding Petitioner's

11  challenge to the 2003 hearing, it is this decision which the Court reviews under 28 U.S.C. § 2254(d).

12  See Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991); Barker v. Fleming, 423 F.3d 1085, 1091-92

13  (9th Cir. 2005), cert. denied, 126 S. Ct. 2041 (2006).

14      Having reviewed the facts of the crime as recited by the BPT and the state court, and the

15  other reasons stated for finding Petitioner ineligible for parole, the Court finds that there was some

16  evidence in the record to support the BPT's decision.

17      The Court concludes that the state court's decision to uphold the BPT's findings was not

18  based on an unreasonable determination of the facts in light of the evidence presented in the state

19  court proceeding, 28 U.S.C. § 2254(d)(2), nor was it contrary to, or an unreasonable application of,

20  clearly established federal law, id. § 2254(d)(1).  Accordingly, Petitioner's due process challenge to

21  his 2003 parole hearing is DENIED.

22

23      **C.      Other Arguments**

24      Petitioner makes three additional arguments:  (1) that to deny him parole based on his

25  commitment offense violates his due process rights, (2) that he is long overdue for parole under the

26  state's sentencing matrix, in violation of his due process rights, and (3) that the implementation of an

27  anti-parole or under-inclusion policy by the BPT also violates his due process rights.  The Court

28  finds that these arguments must fail, as follows:

**1.      *Biggs* Argument**

17

**United States District Court**
For the Northern District of California

1    Petitioner argues that the "Board's continual use of the crime [and] prior history, as a basis to

2  deny parole violates Federal due process." (Pet. at 11.)  Moreover, Petitioner claims that the BPT

3  "relied <u>solely</u> on the commitment offense and prior history, to justify it's [sic] illegal finding of

4  unsuitability." (<u>Id.</u>)  Petitioner cites <u>Biggs</u> for the proposition that "continued reliance in the future

5  on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs

6  contrary to the rehabilitative goals espoused by the prison system and could result in a due process

7  violation." (<u>Id.</u> [quoting <u>Biggs</u>, 334 F.3d at 917].)

8    In <u>Biggs</u>, the prisoner was serving a sentence of twenty-five years to life following a 1985

9  first degree murder conviction.  In the case before the Ninth Circuit, <u>Biggs</u> challenged the 1999

10  decision by the BPT finding him unsuitable for parole despite his record as a model prisoner.  <u>Id.</u> at

11  913.  While the Ninth Circuit rejected several of the reasons given by the BPT for finding Biggs

12  unsuitable, it upheld three:  (1) the commitment offense involved the murder of a witness, (2) the

13  murder was carried out in a manner exhibiting a callous disregard for the life and suffering of

14  another, and (3) Biggs could benefit from therapy.  <u>Id.</u>  The Ninth Circuit found no due process

15  violation and upheld the prisoner's parole denial based solely on the nature of the crime and conduct

16  before incarceration.  <u>Id.</u> at 916.

17    Petitioner's reliance on <u>Biggs</u> to support his argument that denial of suitability in his

18  individual case is misplaced.  First, although the Ninth Circuit in <u>Biggs</u> cautioned the BPT that

19  continued reliance in future parole suitability hearings on the commitment offense may violate due

20  process, <u>id.</u> at 916-17, it did so only in dicta.  Not only is it not Supreme Court law, but the Ninth

21  Circuit has also recently criticized the statements in <u>Biggs</u> as being improper and beyond the scope

22  of the dispute before the court.  The Ninth Circuit stated, "Under AEDPA, it is not our function to

23  speculate about how future parole hearings could proceed."  <u>Sass</u>, 461 F.3d at 1129.  <u>Sass</u> confirmed

24  that "evidence of [a prisoner's] prior offenses and the gravity of his convicted offenses constitute

25  some evidence to support the [b]oard's decision."  <u>Id.</u>  In light of <u>Sass</u>, the BPT's consideration of

26  Petitioner's conviction offense and prior criminal conduct satisfies the minimal "some evidence"

27  requirement.

28

United States District Court

For the Northern District of California

1  Secondly, it must be noted that the BPT did not rely solely on the commitment offense and

2  prior history in denying Petitioner suitability for parole at his fourth parole hearing.  The BPT relied

3  on several factors, including Petitioner's underlying offense, his unstable history and pattern of

4  escalating criminal conduct, his need to continue self-help and therapy, his negative psychological

5  evaluation, and the District Attorney's opposition to parole, before finding him unsuitable for parole.

6  Accordingly, the Court finds no merit to Petitioner's claim because he cannot rely on the

7  dicta in Biggs to demonstrate that the BPT violated his due process rights by denying him parole

8  suitability.

9  **2.    Matrix Argument**

10  Petitioner also argues that the BPT violated his right to due process because he is overdue for

11  release under the BPT's sentencing matrix.  (Pet. at 5-11.)  Petitioner argues that he, with post

12  conviction credits, has "served over 18.5 years, twice his matrix" and that "his term of confinement

13  has become disproportionate to his offense, based on no real evidence that Petitioner is a current risk

14  or threat to society."  (Id. at 6.)

15  As explained previously, the matrix is not consulted and a term is not set under state law

16  unless and until the prisoner is found suitable for parole.  See In re Dannenberg, 34 Cal. 4th at 1070-

17  71; CAL. CODE REGS. tit. 15, § 2403(a).  Petitioner was not found suitable for parole; therefore, the

18  matrix did not need to be consulted.  Moreover, the BPT determined that Petitioner was unsuitable

19  for parole after considering the factors outlined above.  Thus, Petitioner's claim that there was "no

20  real evidence" to deny him parole is unavailing.  Even if Petitioner had a due process right in having

21  state law followed by the parole authority, state law was followed by the BPT.

22  Accordingly, Petitioner's claim is without merit.

23  **3.    Anti-Parole Argument**

24  Petitioner argues that the finding of "unsuitability was arbitrary and capricious, due to the

25  BPT carrying out it's [sic] function of 'under-inclusion' or 'systematic bias,' denying parole to ninety

26  nine percent of all cases that come before it."  (Pet. at 13.)

27  A state prisoner is entitled to habeas relief under 28 U.S.C. § 2254 only if he is held in

28  19

United States District Court
For the Northern District of California

1   custody in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. 2254(a);

2   <u>see also</u> 28 U.S.C. § 2241(c)(3).  A petitioner has the burden of alleging specific facts that show a

3   federal claim is presented, or the petition is subject to dismissal.  <u>Jones v. Gomez</u>, 66 F.3d 199, 204-

4   05 (9th Cir. 1995).  Specific factual allegations, not conclusions, are required.  <u>Id.</u>; <u>Boehme v.</u>

5   <u>Maxwell</u>, 423 F.2d 1056, 1058 (9th Cir. 1970).

6         Here, Petitioner alleges in a conclusory manner that the BPT has an anti-parole or under-

7   inclusion policy because it grants parole in only one percent of cases.  However, he fails to allege

8   any facts demonstrating the BPT's denial of parole was because of such alleged bias instead of the

9   individualized determination of suitability for parole.  Rather, his allegations are limited to one brief

10  paragraph without any citation to the record, other evidence, or any legal authority.  As a result,

11  Petitioner's bias claim is too conclusory to establish a basis for federal habeas relief.  <u>Jones</u>, 66 F.3d

12  at 204-05; <u>Boehme</u>, 423 F.2d at 1058.

13        Even if Petitioner could show the existence of such a policy, the transcript of the proceeding

14  and the decision show that the BPT considered Petitioner's suitability on an individual basis and in

15  considerable detail.  (Resp. Ex. 3.)  Based on the records before the Court, there is no indication that

16  the BPT's decision was based on an anti-parole or under-inclusion policy.

17        Accordingly, the Court finds no merit to Petitioner's due process challenge to his 2003 parole

18  denial based on allegations that the BPT has an anti-parole or under-inclusion policy.

19                                    **<u>CONCLUSION</u>**

20        For the foregoing reasons, the petition for a writ of habeas corpus is DENIED as to all

21  claims.  The Clerk of the Court shall enter judgment, terminate all pending motions, and close the

22  file.

23

24        IT IS SO ORDERED.

25

26  DATED:7/23/07                    _____
                                     SAUNDRA BROWN ARMSTRONG
27                                   United States District Judge

28

20

United States District Court
For the Northern District of California

1
2
3
4                          UNITED STATES DISTRICT COURT
5                                    FOR THE
6                      NORTHERN DISTRICT OF CALIFORNIA
7
8   FLORES,                                    Case Number: CV04-03409 SBA
9            Plaintiff,
10     v.                                      **CERTIFICATE OF SERVICE**
11  SCHWARZENEGGER et al,
12           Defendant.
13  _____/
14
15  I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District
    Court, Northern District of California.
16
17  That on July 23, 2007, I SERVED a true and correct copy(ies) of the attached, by placing said
18  copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said
    envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle
19  located in the Clerk's office.
20
21  Manuel  Flores E-75537
22  Correctional Training Facility
23  P.O. Box 689
24  Soledad,  CA 93960-0689
25
26
27  Dated: July 23, 2007
28
                                       Richard W. Wieking, Clerk

                                       By: LISA R CLARK, Deputy Clerk

                                         21